IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KATHRYN LEE MCLEAN, | ) CASE NO. 1:22-CV-00867-CEH |
| Plaintiff, | ) MAGISTRATE JUDGE <br> ) CARMEN E. HENDERSON |
| v. | ) |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) **MEMORANDUM ORDER AND** <br> ) **OPINION** |
| Defendant, | ) |

### I. Introduction

Plaintiff, Kathryn Lee McLean ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI"), Period of Disability ("POD"), and Disability Insurance Benefits ("DIB"). This matter is before the Court by consent of the parties under 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (ECF No. 10). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding.

### II. Procedural History

Claimant filed applications for SSI, POD, and DIB on May 4, 2020, alleging a disability onset date of April 23, 2020. (ECF No. 9, PageID #: 106). The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 9, PageID #: 109). On May 5, 2021, an ALJ held a telephonic hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 9, PageID #: 109). The ALJ issued a written decision finding Claimant was not disabled. (ECF

No. 9, PageID #: 103). The ALJ's decision became final on March 24, 2022, when the Appeals Council declined further review. (ECF No. 9, PageID #: 53).

Claimant filed her complaint in the U.S. District Court for the Northern District Ohio on May 25, 2022 to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 12, 13). Claimant asserts the following assignment of error:

> (1) The ALJ found McLean's mental impairments were nonsevere as they caused mild limitations in the Psychiatric Review Technique, and she included no mental limitations in the RFC. The ALJ subsequently denied the claim at step four, finding McLean could perform past relevant work at the semi-skilled level. The ALJ erred by failing to consider or adequately articulate the impact of the combined severe and non-severe impairments on McLean's RFC and failing to explain how the mild limitations in basic mental abilities would affect McLean's ability to perform her past relevant semi-skilled work.

(ECF No. 12, PageID #: 699).

### III. Background

#### A. Relevant Testimony

A vocational expert testified at the administrative hearing before the ALJ. The ALJ asked the vocational expert ("VE") a series of hypothetical questions at the administrative hearing. In the first question, the ALJ posed the following hypothetical:

> I'm going to have a light exertional level. I'm going to have no concentrated exposure to dust, fumes or other pulmonary irritants. No extreme heat. No extreme cold. Occasional on ramps and stairs, ladders, ropes and scaffolds. Stoop, kneel, crouch, and crawl. And with those limitations would the hypothetical individual be able to do any past work?

(ECF No. 9, PageID #: 153). The VE testified that Claimant could still work as a customer service representative or bill collector—Claimant's previous positions—with these restrictions.

(ECF No. 9, PageID #: 153–54). The ALJ also asked the VE whether Claimant could perform these positions with mental health limitations including "simple routine, repetitive tasks . . . at the sedentary level" and "simple, routine repetitive tasks with a few variables, little judgment required, with supervision that's simple, direct and concrete and social interactions that's routine and superficial." (ECF No. 9, PageID #: 154). The VE testified that these restrictions would preclude work as a customer service representative. (ECF No. 9, PageID #: 154–55).

**B. Relevant Medical Evidence**

The ALJ also summarized Claimant's mental health records and symptoms:

> The claimant also returned to her PCP in September 2020 and reported worsening anxiety and PTSD. She stated that she had anxiety attacks that felt like a heart attack. She also reported that she had recently attended a consultative examination and had been told then that she had osteoarthritis and degenerative disc disease. Her assessments were anxiety and PTSD, and she requested a referral for further psychiatric treatment. She was to follow up in three months. (Exh. 12F, p. 2-3).
>
> The claimant began counseling and evaluation in late September and reported symptoms associated with anxiety, panic attacks, past trauma, and PTSD. Her diagnoses were PTSD and generalized anxiety disorder. (Exh. 13F, p. 1-8). At appointments in October for therapy and medication management, she reported that she did not handle stress well, that going out into public and being around people made her anxious, that she did not feel particularly anxious when at home, and that she had flashbacks a few times per week. She denied depression. (Exh. 13F, p. 13-14). Exams showed she was casually or well-groomed and had cooperative behavior, average eye contact, clear speech, normal abstraction, tangential/circumstantial thought process, anxious mood and constricted affect, intact memory, good judgment and insight, normal language, normal fund of knowledge, and good attention to evaluation. (Id. at 14-15, 19). The plan was to trial fluoxetine and Vistaril and engage in therapy. Her prognosis was good or guarded depending on the treatment provider. (Id. at 16).
>
> The claimant returned to her PCP in late October 2020 and requested a work up for obstructive sleep apnea, which she stated she had been diagnosed with in the past. She reported snoring,

daytime sleepiness, and observed apneas. A physical exam showed she was alert and oriented, comfortable, cooperative, in no acute distress, pleasant, had normal range of motion in all joints, and had no clubbing in her extremities or edema. Her assessments were hypersomnia and GERD, and she was referred for a sleep study. (Exh. 22F, p. 9-10). She was later diagnosed with obstructive sleep apnea and issued a CPAP. (Exh. 22F, p. 29).

In November 2020, the claimant continued to attend therapy sessions. Her therapist noted that at one session that she appeared disengaged and indicated multiple times that "everything has been good." She also reported that she had taken up crocheting as stress relief. (Exh. 20F, p. 3). At another appointment, it was noted that she was making good progress. (Id. at 6). At a medication management appointment in early December, she reported that medication[s] were really helping. She stated that she mostly took Vistaril when she left the house to shop. (Exh. 20F, p. 11). She continued to experience daytime fatigue and awakening at night due to shortness of breath. (Id.). An exam at that time showed she was pleasant and cooperative, had average speech, had "better" mood, had euthymic affect, was alert and oriented, had intact short-term and remote memory, had linear and goal-directed thought process, denied SI symptoms, and had intact insight and judgment. (Id. at 12). She continued to make good progress in therapy. (Id. at 19, 28). The same month, she also attended a pulmonology appointment. She reported an incident several days before where she awoke and felt chest pressure. She used albuterol and her nebulizer at that time. She reported that she tried not to use the nebulizer very often (usually just before bed if needed) but that she had been using it two to three times per day since the recent episodes, and that it seemed to help some. She also reported that she continued to smoke and denied any hospitalizations or ER visits due to pulmonary issues. An exam showed she was comfortable, had normal heart sounds, and had scattered inspiratory wheezes and scattered wheezes throughout. Her assessments were COPD, GERD, obstructive sleep apnea, abnormal chest x-ray, and nicotine dependence. The plan was to start her on Symbicort. (Exh. 27F, p. 3-4).

[. . .]

At a medication management appointment in March 2021, she reported that she was still having some days where generalized anxiety was bothersome, but that she was doing "alright," took Vistaril sparingly, and did not feel she experienced increased anxiety attacks. She also reported that she had a good mood most

> days and felt like she was making good progress in therapy. (Exh. 20F, p. 30). An exam showed she was pleasant and cooperative, had average speech, had self-described "anxious" mood, was alert and fully oriented, attended to questions during the appointment, had intact insight and judgment, and had linear and goal-directed thought process. Her fluoxetine dosage was increased. (Id. at 31-32).

(ECF No. 9, PageID #: 112–15).

### C. Relevant Expert Opinions

There are several expert opinions the ALJ reviewed in this case. First, she reviewed the state agency medical consultants and summarized their opinions:

> state agency medical examiners Drs. William Harrison and Christal Janssen and Drs. Jonathan Norcross and Abesie Kelly reviewed the record at the initial and reconsideration levels, respectively, and found the claimant has three severe impairments (osteoarthrosis, disorders of the back, and COPD), one nonsevere impairment (anxiety), and was able to perform work at the light exertional level with the need to avoid concentrated exposure to pulmonary irritants. (Exh. 3A, 4A, 7A, 8A)

(ECF No. 9, PageID #: 116–17). The ALJ also summarized the opinion of Dr. R. Sam Boyd, Ph.D., who completed a mental diagnostic evaluation:

> The first was a mental diagnostic evaluation performed by R. Sam Boyd, Ph.D. in July 2020. The claimant reported a number of physical problems, in addition to anxiety caused by a history of two abusive relationships. She reported symptoms that included sensitivity to loud noises, anxiety in large crowds, and physical symptoms such as muscle tension, shortness of breath, sweating, and hot flushes that occurred without specific triggers. These episodes could occur several times a day or intermittently without symptoms for several weeks at a time. The claimant denied recent counseling, taking psychiatric medications, or a history of inpatient treatment. It was noted that she had a driver's license, adequate grooming, unremarkable gait and posture, no unusual behaviors, pleasant and cooperative behavior, full and stable affect, euthymic mood, normal speech, full orientation, logical and well-organized conversation, and no SI symptoms. Dr. Boyd assessed the claimant as functioning in the average range of intelligence. In addition, he assessed her with panic disorder, although he noted that based on

5

> her reports that the symptoms occurred intermittently, her panic symptoms did not consistently interfere with social or occupational functioning, were relatively mild, were not frequent enough to interfere with her ability to cope with the demands of basic work-like tasks, and also did not indicate she was unable to maintain the concentration, persistence, and pace required of basic work-like tasks. (Exh. 6F).

(ECF No. 9, PageID #: 117).

Claimant's counselor, Mr. Joshua Dye, also provided an opinion in this case. (*See* ECF No. 9, PageID #: 503–06). The ALJ summarized the recommendation in her opinion:

> The claimant's counselor, Joshua Dye, completed a November 2020 mental source statement in which he assessed the claimant as likely to miss four or more days of work per month; the likelihood of being off-task 25 percent or more of the workday; and marked or extreme limitations in almost all indicated tasks related to understanding/remembering, concentrating and persisting, interacting, and adapting. (Exh. 16F).

(ECF No. 9, PageID #: 118).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
>
> 2. The claimant has not engaged in substantial gainful activity since April 23, 2020, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).
>
> 3. The claimant has the following severe impairments: lumbar spine moderate to severe loss, spurring, osteoarthritis, and mild lordosis; chronic obstructive pulmonary disease [COPD]; and atrial tachycardia (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; must avoid concentrated exposure to dust, fumes, or other pulmonary irritants; and must avoid exposure to extreme heat and cold.
>
> 6. The claimant is capable of performing past relevant work as a Bill Collector (DOT 241.367-010/light/svp 4) and Customer Service Representative (DOT 249.362- 026/sedentary/svp 4). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from April 23, 2020, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(ECF No. 9, PageID #: 108, 109, 110, 111, 118).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007)

(citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (en banc)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to SSI or DIB: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. Discussion

Claimant raises a two-part assignment of error. She first argues the ALJ neither "consider[ed Claimant's] non-severe mental impairments in combination [with] her severe physical impairments" nor "explain[ed] why she omitted any mental limitations from the RFC."

8

(ECF No. 12, PageID #: 709–10). Claimant then contends the ALJ "failed to explain how McLean's mental impairments—which she found caused a mild limitation in two areas of basic mental functioning—would impact McLean's ability to perform past relevant work." (ECF No. 12, PageID #: 709). The Court addresses each argument in turn.

    a. **RFC**

Claimant contends the ALJ simply summarized the mental health records rather than explaining how the RFC accounted for them. (ECF No. 9, PageID #: 711 (citing *Patterson v. Colvin*, No. 5:14 cv 1470, 2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015); *Kochenour v. Comm'r of Soc. Sec.*, No. 3:14-CV-2451, 2015 WL 9258609, at *6 (N.D. Ohio Dec. 18, 2015))). She claims the ALJ erred in failing to "articulate why [Claimant's] mental impairments did not require a more limited RFC." (ECF No. 12, PageID #: 711). Specifically, she claims that the ALJ did not address Claimant's mental health in her "analysis" section and challenges the ALJ's failure to adopt the mild restrictions allegedly outlined in Dr. Boyd's opinion, despite finding his opinion persuasive. (ECF No. 12, PageID #: 711, 712). As a result, Claimant argues "it is not evident from the decision as a whole why the ALJ chose to omit any mental limitation from the RFC when the ALJ's own findings indicated that there would be at least some limitation." (ECF No. 12, PageID #: 714).

The Commissioner argues that substantial evidence supports the ALJ's determination that Claimant did not have severe mental limitations. (ECF No. 13, PageID #: 732). The Commissioner then cites a number of records the ALJ relied on in her analysis to demonstrate that she correctly found the impairments to be non-severe. (ECF No. 13, PageID #: 733–35). But this analysis entirely misses the mark. Claimant is not arguing that the ALJ should have found her to have severe mental impairments, but rather, that the ALJ failed to specify why she did not

9

include mental restrictions in the RFC. The Commissioner fails to address this argument. Nonetheless, the Court will review Claimant's argument below.

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* § 416.945(a). Here, the ALJ determined Claimant's RFC as follows:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; must avoid concentrated exposure to dust, fumes, or other pulmonary irritants; and must avoid exposure to extreme heat and cold.

(ECF No. 9, PageID #: 111). When supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive—even if this Court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek v. Comm'r of Soc. Sec.,* 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen*, 800 F.2d at 545.

The ALJ here did not adopt mental restrictions in the RFC. However, her reasoning clearly demonstrates that she reviewed and considered Claimant's mental health in her RFC analysis. First, she summarized the records related to Claimant's psychiatric health at length:

> The claimant also returned to her PCP in September 2020 and reported worsening anxiety and PTSD. She stated that she had anxiety attacks that felt like a heart attack. She also reported that she had recently attended a consultative examination and had been told then that she had osteoarthritis and degenerative disc disease. Her assessments were anxiety and PTSD, and she requested a referral for further psychiatric treatment. She was to follow up in

10

three months. (Exh. 12F, p. 2-3).

The claimant began counseling and evaluation in late September and reported symptoms associated with anxiety, panic attacks, past trauma, and PTSD. Her diagnoses were PTSD and generalized anxiety disorder. (Exh. 13F, p. 1-8). At appointments in October for therapy and medication management, she reported that she did not handle stress well, that going out into public and being around people made her anxious, that she did not feel particularly anxious when at home, and that she had flashbacks a few times per week. She denied depression. (Exh. 13F, p. 13-14). Exams showed she was casually or well-groomed and had cooperative behavior, average eye contact, clear speech, normal abstraction, tangential/circumstantial thought process, anxious mood and constricted affect, intact memory, good judgment and insight, normal language, normal fund of knowledge, and good attention to evaluation. (Id. at 14-15, 19). The plan was to trial fluoxetine and Vistaril and engage in therapy. Her prognosis was good or guarded depending on the treatment provider. (Id. at 16).

The claimant returned to her PCP in late October 2020 and requested a work up for obstructive sleep apnea, which she stated she had been diagnosed with in the past. She reported snoring, daytime sleepiness, and observed apneas. A physical exam showed she was alert and oriented, comfortable, cooperative, in no acute distress, pleasant, had normal range of motion in all joints, and had no clubbing in her extremities or edema. Her assessments were hypersomnia and GERD, and she was referred for a sleep study. (Exh. 22F, p. 9-10). She was later diagnosed with obstructive sleep apnea and issued a CPAP. (Exh. 22F, p. 29).

In November 2020, the claimant continued to attend therapy sessions. Her therapist noted that at one session that she appeared disengaged and indicated multiple times that "everything has been good." She also reported that she had taken up crocheting as stress relief. (Exh. 20F, p. 3). At another appointment, it was noted that she was making good progress. (Id. at 6). At a medication management appointment in early December, she reported that medication[s] were really helping. She stated that she mostly took Vistaril when she left the house to shop. (Exh. 20F, p. 11). She continued to experience daytime fatigue and awakening at night due to shortness of breath. (Id.). An exam at that time showed she was pleasant and cooperative, had average speech, had "better" mood, had euthymic affect, was alert and oriented, had intact short-term and remote memory, had linear and goal-directed thought process, denied SI symptoms, and had intact insight and

11

> judgment. (Id. at 12). She continued to make good progress in therapy. (Id. at 19, 28). The same month, she also attended a pulmonology appointment. She reported an incident several days before where she awoke and felt chest pressure. She used albuterol and her nebulizer at that time. She reported that she tried not to use the nebulizer very often (usually just before bed if needed) but that she had been using it two to three times per day since the recent episodes, and that it seemed to help some. She also reported that she continued to smoke and denied any hospitalizations or ER visits due to pulmonary issues. An exam showed she was comfortable, had normal heart sounds, and had scattered inspiratory wheezes and scattered wheezes throughout. Her assessments were COPD, GERD, obstructive sleep apnea, abnormal chest x-ray, and nicotine dependence. The plan was to start her on Symbicort. (Exh. 27F, p. 3-4).
>
> [. . .]
>
> At a medication management appointment in March 2021, she reported that she was still having some days where generalized anxiety was bothersome, but that she was doing "alright," took Vistaril sparingly, and did not feel she experienced increased anxiety attacks. She also reported that she had a good mood most days and felt like she was making good progress in therapy. (Exh. 20F, p. 30). An exam showed she was pleasant and cooperative, had average speech, had self-described "anxious" mood, was alert and fully oriented, attended to questions during the appointment, had intact insight and judgment, and had linear and goal-directed thought process. Her fluoxetine dosage was increased. (Id. at 31-32).

(ECF No. 9, PageID #: 112–14). Notably, the ALJ observed that providers described Claimant's mental health as "good" or "normal" and Claimant herself stated it was improving at her November 2020 and March 2021 appointments. (ECF No. 9, PageID #: 112, 113).

The ALJ then reviewed the expert opinions and their mental health recommendations. The ALJ found the opinions of the state agency medical examiners Dr. William Harrison, M.D., Christal Janssen, Psy.D., Dr. Jonathan Norcross, M.D., and Dr. Abesie Kelly, Ph.D. persuasive and noted that they found Claimant to have non-severe mental impairments. (ECF No. 9, PageID #: 116–17). She also summarized the opinion of Dr. R. Sam Boyd, Ph.D., who completed a

12

mental diagnostic evaluation:

> The first was a mental diagnostic evaluation performed by R. Sam Boyd, Ph.D. in July 2020. The claimant reported a number of physical problems, in addition to anxiety caused by a history of two abusive relationships. She reported symptoms that included sensitivity to loud noises, anxiety in large crowds, and physical symptoms such as muscle tension, shortness of breath, sweating, and hot flushes that occurred without specific triggers. These episodes could occur several times a day or intermittently without symptoms for several weeks at a time. The claimant denied recent counseling, taking psychiatric medications, or a history of inpatient treatment. It was noted that she had a driver's license, adequate grooming, unremarkable gait and posture, no unusual behaviors, pleasant and cooperative behavior, full and stable affect, euthymic mood, normal speech, full orientation, logical and well-organized conversation, and no SI symptoms. Dr. Boyd assessed the claimant as functioning in the average range of intelligence. In addition, he assessed her with panic disorder, although he noted that based on her reports that the symptoms occurred intermittently, her panic symptoms did not consistently interfere with social or occupational functioning, were relatively mild, were not frequent enough to interfere with her ability to cope with the demands of basic work-like tasks, and also did not indicate she was unable to maintain the concentration, persistence, and pace required of basic work-like tasks. (Exh. 6F).

(ECF No. 9, PageID #: 117). The ALJ found this mental health opinion persuasive. (ECF No. 9, PageID #: 117).[1] Finally, she rejected the strict mental restrictions of Joshua Dye, Claimant's counselor. Mr. Dye completed a mental source statement in November 2020 and opined that Claimant would likely miss four or more days of work per week, be off-task twenty-five percent of the workday, and require marked or extreme limitations for understanding and remembering,

---

[1] While Claimant argues that Dr. Boyd's opinion supports the adoption of a concentration, persistence, or pace limitation, Dr. Boyd made no such recommendation. (*See* ECF No. 12, PageID #: 712). Claimant ignores Dr. Boyd's clear observation that "[t]here is no reason to believe that [Claimant] could not maintain the concentration, persistence, and pace required of basic work-like tasks." (ECF No. 9, PageID #: 451). Thus, the Court rejects Claimant's argument that the ALJ improperly found Dr. Boyd's opinion persuasive but failed to actually adopt his recommendations.

concentrating and persisting, interacting, and adapting. (ECF No. 9, PageID #: 504–05). The ALJ found this opinion unpersuasive as the "extreme assessments [were] not supported by the record, including [the fact] that examinations consistently showed no issues with memory or attention/concentration and no cognitive impairments." (ECF No. 9, PageID #: 118).

Although the ALJ never explicitly stated why she did not adopt mental health restrictions, it is clear she found that Claimant did not need them. First, she noted providers' repeated references to Claimant "good" or "normal" mental health evaluations. (ECF No. 9, PageID #: 112, 113). Although she acknowledged Claimant's anxiety, she also noted that Claimant denied depression and alleged that her mental health was stable and improving. (ECF No. 9, PageID #: 113–14). In March 2021, the ALJ noted that Claimant said she was "alright" most days, experienced a good mood most days, and was making progress in therapy. (ECF No. 9, PageID #: 114). Next, the opinions the ALJ found persuasive did not recommend mental health restrictions. Dr. Boyd specifically opined that Claimant's "symptoms of panic are relatively mild. They are not frequent enough to interfere with her ability to cope with the demands of basic work-like tasks. There is no reason to believe that she could not maintain the concentration, persistence, and pace required of basic work-like tasks." (ECF No. 9, PageID #: 451). The ALJ noted this in her decision. (ECF No. 9, PageID #: 117). Based on these observations, it is clear the ALJ found that Claimant's health did not warrant additional mental restrictions in the RFC. Substantial evidence supports this decision.

Moreover, Mr. Dye was the only expert who recommended specific mental health restrictions. But his extreme recommendations would have allowed Claimant to miss over forty workdays a year. (*See* ECF No. 9, PageID #: 504). Additionally, he offered his opinion several months before Claimant noted additional progress in therapy and experienced a "good mood

14

most days." (*See* ECF No. 9, PageID #: 548). For these reasons and more, the ALJ found Mr. Dye's opinion "extreme" and ultimately unpersuasive. (ECF No. 9, PageID #: 118). This also indicates that the ALJ did not believe such psychological restrictions were warranted. Thus, based on the ALJ's summary of the mental health records, as well as her review of the mental health opinions, the Court finds that the ALJ built a logical bridge between the record and her decision not to include mental health limitations in the RFC.

Claimant's reliance on *Kochenour* and *Patterson* is inapt. In *Kochenour*, the ALJ "fail[ed] to analyze, or even mention, Plaintiff's depression anywhere in the decision after finding the impairment not severe at step two." 2015 WL 9258609, at *6. Likewise, the *Patterson* ALJ primarily focused on the claimant's physical health during his RFC analysis, "without any discussion of whether her non-severe mental impairments [would] contribute, in any way, to an inability to perform substantial gainful work." 2015 WL 5560121, at *5. In contrast, the ALJ here extensively discussed Claimant's mental health in the RFC analysis, including experts' opinions regarding the impairments. (*See* ECF No. 9, PageID #: 112–18).[2]

Substantial evidence supports the ALJ's decision not to adopt mental health restrictions, and she built a logical bridge between the evidence and her RFC. By discussing Claimant's mental and physical health extensively, she clearly considered the combined effects of Claimant's severe and non-severe impairments. Accordingly, the Court will not disturb the ALJ's decision.

---

[2] Claimant repeatedly insinuates that the ALJ's finding at Step Two that Claimant had mild mental limitations demonstrates that mental restrictions should have been adopted in the RFC. (*See* ECF No. 12, PageID #: 710). This reasoning is flawed for two reasons. First, Claimant has provided no authority demonstrating that ALJs are mandated to adopt such restrictions in the RFC. Second, if Claimant is correct, and Step Two limitations automatically warrant RFC restrictions, Step Four RFC analysis would be unnecessary and superfluous. This is of course, not the case. The Court accordingly rejects such an argument.

### b. Past Relevant Work

Claimant also challenges the ALJ's finding that she could complete past relevant work. She argues the ALJ "provided no discussion of the impact of [Claimant's] medically determinable mental impairments on her ability to work at any skill level." (ECF No. 12, PageID #: 717). Claimant contends that the ALJ merely "provided boilerplate language that the vocational expert testified that an individual with the RFC could perform the physical and mental demands of past relevant work, but this statement did not address any pertinent details in this case." (ECF No. 12, PageID #: 717). Respondent does not address this argument in its response brief.

Claimant is mistaken regarding the ALJ's requirements in determining whether she can perform past relevant work. The ALJ is under no obligation to discuss the impact of a claimant's medically determinable impairments on their ability to work at any skill level. *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007). Rather, as discussed above, the ALJ has an obligation to consider Claimant's severe and non-severe impairments in determining the RFC. *See* SSR 98-6p, 1996 WL 374184, at *5 (1996). As previously discussed, the ALJ considered Claimant's non-severe mental impairments and substantial evidence supports the ALJ's decision not to include any mental health limitations in the RFC.

Once the RFC is determined, the ALJ moves to Step Four. At Step Four, the claimant must prove that she cannot perform her past relevant work as actually or generally performed. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Studaway v. Sec'y of HHS*, 815 F.2d 1074, 1076 (6th Cir. 1978) (noting that the claimant "must prove an inability to return to his former type of work and not just to his former job"). In evaluating whether the claimant can perform her past relevant work, the ALJ must make specific factual findings regarding: (1) the claimant's RFC; (2) the

16

physical and mental demands of the past job/occupation; and (3) whether the claimant's RFC would permit a return to his or her past job or occupation. SSR 82-62, 1982 SSR LEXIS 27, at *10 (S.S.A. Jan. 1, 1982). The claimant's RFC represents their maximum physical and mental abilities, despite the "impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." § 416.945(a)(1).

The ALJ may ask a vocational expert to testify if the case has complex issues or if the ALJ must determine whether the claimant can perform her past relevant work. § 416.960(b)(2). The ALJ "may use the services of vocational experts or vocational specialists, or other resources, such as the [DOT] . . . to obtain evidence . . . need[ed] to help [him] determine whether [the claimant] can do [her] past relevant work, given [her] residual functional capacity. *Id.* A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy." § 416.960(b)(2). If the ALJ asks the vocational expert whether there is a "discrepancy between [the vocational expert's] opinion and the DOT requirements," then the ALJ has complied with agency policy for using a vocational expert. *Beinlich v. Comm'r of Soc. Sec.*, No. 08-4500, 2009 WL 2877930, at *4 (6th Cir. Sept. 9, 2009)). In the Sixth Circuit, "the ALJ is under no obligation to investigate the accuracy of the [vocational expert]'s testimony beyond the inquiry mandated by SSR 00-4p." *Id.* Rather, that "obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the [vocational expert] and bring out any conflicts with the DOT." *Id.*

Here, the ALJ asked the vocational expert ("VE") a series of hypothetical questions at the administrative hearing. In the first question, the ALJ posed the following hypothetical:

> I'm going to have a light exertional level. I'm going to have no concentrated exposure to dust, fumes or other pulmonary irritants. No extreme heat. No extreme cold. Occasional on ramps and stairs, ladders, ropes and scaffolds. Stoop, kneel, crouch, and crawl. And with those limitations would the hypothetical individual be able to do any past work?

(ECF No. 9, PageID #: 153). These restrictions are the same limitations the ALJ ultimately adopted in her RFC, which was supported by substantial evidence. (*See* ECF No. 9, PageID #: 111, 153). In response to the hypothetical, the VE testified that Claimant could still work as a customer service representative or bill collector—Claimant's previous positions—with these restrictions. (ECF No. 9, PageID #: 153–54). Thus, the ALJ ultimately found that Claimant could still perform her past relevant work with the restrictions she included in the RFC. (ECF No. 9, PageID #: 118). Substantial evidence supports this finding since the VE testified that Claimant could perform these jobs and such testimony constitutes substantial evidence. *See Louden v. Comm'r of Soc. Sec.*, 507 F. App'x 497, 499 (6th Cir. 2012) ("[T]he vocational expert's testimony constituted substantial evidence that Louden could perform her past relevant work as a parking attendant.").

The Court notes that the ALJ asked another hypothetical regarding Claimant's mental health. The ALJ asked whether Claimant could perform these positions with mental health limitations including "simple routine, repetitive tasks . . . at the sedentary level" and "simple, routine repetitive tasks with a few variables, little judgment required, with supervision that's simple, direct and concrete and social interactions that's routine and superficial." (ECF No. 9, PageID #: 154). The VE testified that these restrictions would preclude work as a customer service representative. (ECF No. 9, PageID #: 154–55).

18

While this hypothetical did include some mental health limitations, the ALJ ultimately found these limitations were unnecessary in the RFC. As discussed above, the ALJ built a logical bridge explaining why the mental health limitations were unnecessary and substantial evidence supports that decision. Thus, Claimant's attempt to essentially reraise her argument that the ALJ erred in not including mental health limitations in the RFC fails. Accordingly, the ALJ did not err in not addressing Claimant's ability to work at any skill level with mental health restrictions since she was not required to consider limitations that were not in the RFC when making a relevant part work determination. As substantial evidence supports this decision, the Court will not disturb it.[3]

### VI. Conclusion

Based on the foregoing, it the Court AFFIRMS the Commissioner of Social Security's nondisability finding.

Dated: April 27, 2023

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

[3] Claimant makes a cursory argument that the ALJ used "boilerplate language" in her hypothetical questions to the VE. (ECF No. 12, PageID #: 717). However, Claimant fails to explain how or why the language was suspect, much less provide case law expounding upon or supporting this argument. As such, the argument is deemed waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.").